## THE HYPODAME.

1. In cases of collision depending on fact, where the evidence is conflicting, this court will not readily reverse a decree made by the District, and affirmed by the Circuit Court. It declares that the District Court, which can examine witnesses *ore tenus*, and summon, if it pleases, experienced masters of vessels to help them, as Trinity masters do the English courts in cases depending on nautical experience, has better opportunities than any other courts can have for examining such cases, and for forming correct conclusions on them.
2. When a steam vessel proceeding in the dark hears a hail before it from some source which it cannot or does not see, it is the duty of the steam vessel instantly to stop and reverse her engine; not simply to "slow."
3. The captain of a steam propeller is not a competent lookout; though the propeller be a river propeller and not a steamer of the larger size. There should be a lookout specially placed to see what is ahead.

---

* 1 Notes of Cases, 508.

4. Where a collision at night between a steamer and a sailing vessel is the consequence of a sudden and unexpected change of course on the part of the steamer, which produces a sudden peril and leaves no time to the sailing vessel to display a light before a collision—or do more than shout—where the steamer, if it had had a sufficient lookout, might easily have avoided the collision, it has no right to demand that the damages should be divided as where both are in fault.

5. Though damages for collision ought not to be awarded to an amount beyond the stipulation given on the release or discharge of the offending vessel from attachment, yet within that amount they may be given, though exceeding those claimed by the libel originally, and while it was uncertain what the damages would be, if the libel have been properly amended.

APPEAL from the Circuit Court for the Southern District of New York.

Chapin libelled the propeller Hypodame for a collision which had occurred on the Hudson River, on a December night, 1862, a little below Dunderberg, between the propeller just named, then going up the river, and a schooner of his descending it, by which the schooner was struck on its port side near the cathead, split open for ten feet or more, and sunk before she could be towed into shallow water.

His allegation was that the propeller, ascending the river on its *east* side, at the rate of eleven or twelve miles an hour, with no proper lookout stationed or attending to his duty, with plenty of room to have passed safely, had not done so, but, making a rank sheer from her previous course, though hailed by the schooner, and though the hail was heard, had run at full speed into the schooner, descending the river on its west side at the rate of but a mile and a half an hour, and sunk her; that by reason of the collision he had been put to great expense to raise and recover the vessel and cargo; to repair the one and save the other, " *the amount and particulars whereof could not as yet be correctly stated*," but would as believed " *exceed* in the aggregate $6000."

On the other hand, the answer denied that the propeller was going at any such rate of speed as that pretended by the libel, averring that the speed was much slower than even six miles an hour; in fact, " very slow;" that she had one bright light on the stem forward, which shone right ahead, and four

points on either bow; two bright lights on the flag-staff aft, which shone all around; a red light on the larboard side, and a green light on the starboard; *with a competent lookout* placed in a proper position on the forward part of the propeller, and attentive to his duty, as was the master, and also the other officers; that to avoid an apprehended danger with a steam-tug. and tow descending the river, she had changed her course to the westward, giving the usual signal of such intention by two blasts of ·her steam whistle; that shortly after this change of course had been made, a hail was heard on board the propeller from *some* boat or vessel on the river, but that no boat or vessel could be seen from the propeller by reason of the darkness of the night and from the omission on the part of the vessel to show any light; that the propeller's engine was immediately *slowed*, and *then* stopped, when, at that same moment, the headlights of the propeller, shining on the sails of a vessel, revealed, for the first time, the schooner; that the bells of the propeller were rung to reverse the engine, and that this was promptly done, and the steamer's helm ported to ease the blow of the collision; inevitable, now, however, by any effort on the part of the propeller, from the close proximity and course of the schooner at the time of the hail and of the discovery on the propeller of her critical position.

The facts as assumed by both the courts below, were essentially these:

The night was dark. Those in charge of the schooner discovered the lights of the steamer after she had rounded Verplanck's Point, about two miles below the place of collision. The schooner was moving very slowly down the river, west of the middle of the stream, the steamer coming up at the rate of six to eight miles on the east side, a course which, if it had been continued, would have carried her clear of the schooner. After the steamer had passed Verplanck's Point, she discovered a tow descending the river, and was about to go to the eastward, when, seeing the light of a vessel on the east, the master decided to pass to the westward of the tow, and starboarded his vessel for that purpose, making in fact

a rank sheer.   He had hardly got her head turned so as to clear the tow when he heard a shout, and he told the man at the wheel to *slow* the boat.   Supposing that the sound came from some small boat, he asked the helmsman where the boat was.   The man replied that he saw nothing; the steamer's head-lights the next moment shining full upon the sails of a schooner, not till this moment thought of, but now seen immediately under the bow, and some one on board of her shouting out, " In the name of heaven, are you coming into us? are you going to sink us?"   The helmsman testified that when he heard the first shout, he told the captain to stop the boat, that there was something ahead; and that the captain did not stop her.   The steamer had no lookout except the captain, who had charge of navigating her.   Though the night was dark, the court " could not conclude from the evidence that a proper lookout on the bow of the steamer would not have discovered her in time to have cleared her." Witnesses from the schooner testified that by a good lookout she might have been seen half a mile off.

The schooner was neither carrying a light at the time of the accident nor exhibited one; no statute at that time compelled her to carry one.   She had, however, a lookout.   It did not appear that she understood the meaning of steam-signals.

Though a hawser was thrown from the steamer at once, and made fast to the schooner, with a view of towing her into shoal water, the blow from the steamer had so laid her open, that she went down almost immediately..   She was, however, ultimately raised and repaired at large cost, as here-after mentioned.

On this case the District Court considered that the propeller was the sole cause of the collision, and should be made liable for all the damages.

As respected these, the libel, as already said, alleged that they would exceed $6000, and stipulations for costs and value were entered into and accepted for $7250.   But upon the reference, the proof showed, and the commissioner reported, that they amounted to a larger sum.   The claimant

filed various exceptions to the commissioner's report; the most important one having been that he had erred in allowing any greater amount of damages than what had been claimed in the libel, viz., $6000; whereupon the libel was amended by increasing the sum originally claimed by it. The District Court entered its decree for $7513.07. Upon appeal to the Circuit Court, it appearing that that sum with interest and costs exceeded the stipulations, the excess was struck out, thus reducing the recovery to $7250 for the damages and costs, that being the amount of the stipulation, and, with this reduction, the Circuit Court affirmed the decree of the District Court.

The whole case was now here for review.

*Mr. Van Santvoord, for the appellants :*

I. After the propeller signalled by her steam-whistle her intention to change her course and to pass toward the side of the river where the schooner was, the schooner should have exhibited a light, to show that she was on the river, and her position there. The night was dark, and the schooner could reasonably have inferred that the steamer might not, as she did not, see her.

Whatever may be the rule in respect to the duty of sailing vessels to exhibit a light at night on the high seas, it would seem to be the rule in this country, that vessels sailing at night in narrow waters like the Hudson, must exhibit a light to an approaching vessel.

In *The Osprey*,* in the third circuit, a case of collision on a river, the court say :

"The rule of passing to the right, or porting the helm, in the case of vessels meeting on the same line, is founded upon the supposition that each party can see the other. But when one is blind and the other knows it, he should not put himself within reach of injury by any mistake of the blind."

And though the court there said that it could not "estab-

* 2 Wallace, Jr., 268; and see Peck *v* Sanderson, 17 Howard, 178; also, Jacobsen, Sea Laws, 340; The Scioto, Davies, 359, per Ware, J.

lish any rule to bind vessels navigating the high seas after night to carry signal lights," they yet declared that "where one party does this, and the other does not, we can and will treat the dark boat as the wrongdoer."

We desire not even so much as the application of this principle. If the schooner had only shown a light for the moment it would have been sufficient. By not having done so, the persons navigating her were, themselves, the authors of her misfortune.

II. As respects the propeller. Was there fault on her part? We think not.

1. As to the lookout. The Hypodame was a river propeller, as the case shows; not one therefore that carried passengers, nor a large or first-class propeller, such as navigate the ocean; but one of a class on our rivers navigated by the master, who is also a pilot, and a steersman, alternating with a pilot and a steersman, and on which the master or steersman, on the master's watch, acts as lookout, and the pilot or steersman, on the pilot's watch, acts as lookout while the other steers. There can be no reasonable intendment that without the exhibition of a light the schooner would or could have been earlier seen by any number of lookouts on the propeller assigned to that special duty; and to impute negligence to the propeller, which had a right to act upon the supposition that if there was a vessel sailing off to westward in the darkness, on the propeller's change of course she would exhibit a light, on the ground that she had no other lookout than is usual on vessels of her class, would seem to be straining a point to charge the propeller.

2. The propeller slowing, stopping her engine and shifting her helm to port on hearing the hail, after she had been on the course toward the place of the schooner for four or five minutes and within five or six seconds of the collision, instead of slowing, stopping, and backing, is not to be regarded as a fault. A propeller, even if not of the higher class, is yet, with her water-tanks, fuel, and engines, very heavy, weighing doubtless from two to three hundred tons. Such a vessel cannot be brought to a dead stop in the water in less than

one and a half to two minutes while she sheers quick. If the pilot erred in this matter, it should be attributed to the suddenness of the emergency caused by the omission of the schooner to exhibit a light.

But if the propeller should be adjudged to have been in fault, the schooner was clearly in fault also in not exhibiting a light on the propeller's change of direction toward her, and the damages should be divided.

III. As to the damages, it is submitted that no greater should be allowed than were claimed in the libel.

*Mr. Owen,* contra:

I. The propeller was clearly and alone in fault, and is responsible for all damages.

1. She was in fault in not having a competent lookout properly stationed and faithfully attending to that duty. No person pretends to have acted as lookout except the captain, and he was incompetent, as he had other duties to perform in piloting his vessel, signalling and passing the descending tow.*

2. She was also in fault in proceeding forward after hearing the shout from the schooner. She should have stopped immediately.†

II. The schooner was not in fault. The collision was not caused by any act or omission on her part.

The only fault alleged against her is, that she did not display a light on the approach of the propeller. But the law did not at that time require her to carry, nor, unless the night was so dark that she could not have been seen by a vigilant lookout on the propeller far enough to have avoided her, even to exhibit a light. In addition, the sheer was abrupt, rank, and totally unexpected, so that there was no sufficient time afterwards and before the collision to display a light.

But if there had been sufficient time to display a light,·

---

* The Ottawa, 3 Wallace, 268; Chamberlain *v.* Ward, 21 Howard, 548; Henry *v.* Balt. Packet, 23 Id. 287.

† Nelson *v.* Leland, 22 Howard, 48.

still that would have been no better than the shout. And even though a light might have been better than the hail, still the schooner should not be held responsible, if, under the impending danger in which she was suddenly placed, without any previous fault on her part, she failed to adopt the best mode of disclosing her presence.

III. As to the damages. When the libel was filed the amount and particulars of damages, it was stated, could not be specified, though it was asserted that they would exceed $6000. Certainly when it was discovered on the raising of the vessel that they would so exceed the sum, the libel was rightly amended. Being within the stipulation, the appellant has no cause of complaint, as they have been reduced by the Circuit Court below the amount really lost.

*Reply:* All the cases cited in regard to lookouts, and that there should be on vessels a lookout specially designated *ad hoc*, will be found, on examination, to be cases of vessels quite different from our ordinary river propellers; steamers of a larger class, having their pilot-houses on hurricane decks high up, and where, unless a person stands on the bow all the time, he cannot see; steamers employing moreover and requiring in their navigation a fuller complement of men; making it practicable to assign a greater number of men to different duties, but without in general securing a better result, so far as exemption from casualties is concerned, than is accomplished by a smaller force on steamers of the class of the Hypodame.

Mr. Justice GRIER delivered the opinion of the court.

In cases of collision the testimony is often conflicting and irreconcilable. Each party can make out a plausible case supported by some evidence. In such cases we have frequently decided that where the district and circuits concur in opinion on the facts, and there is testimony supporting their decision, we will not reverse it on doubts raised by ingenuity of counsel.*

---

* See Norton *v.* Newell and Ship, 3 Wallace, 267.

The District Courts have better opportunities for examin-
ing such cases and forming a correct conclusion than any
other. They may examine witnesses *ore tenus*, and although
they may not have Trinity masters to assist them, yet in
difficult cases depending on nautical experience the judge
may call to his aid experienced masters of vessels (as is
done in one district at least),* whose report will greatly assist
the court in coming to a correct conclusion.

In the case before us we see no reason to doubt that the
conclusions of both courts below on the facts in the case are
correct.

We concur also with the court below, that the propeller
had no competent lookout, as required by the frequent de-
cisions of this court.† The evidence shows that the schooner
might have been seen a half-mile off if there had been a
competent lookout.

When the propeller made the sudden sheer towards the
western shore, the man at the wheel told the captain "to
stop the boat, there was something ahead; he did not stop
her; her wheel was then put to port. I then pulled the
bell," &c.

The sheer was abrupt and totally unexpected. Previous
to that there was no danger calling for any peculiar precau-
tions. The schooner was in her proper place, and could not
possibly anticipate such a sudden change of course. All
they could do under the circumstances was to shout—they
were heard—but no attention was paid to the warning.
Producing a light at that time would have been equally
unavailing.

The defence relied on here was, that the schooner was in
fault in not exhibiting a light on the propeller's change of
direction towards her. The collision took place before the
passage of the act of the 20th of April, 1864. This act
(article 5th) requires sailing ships, "under way or being
towed, to carry the same lights as steamships under way,
with the exception of *the white mast-head lights, which they*

---

* The Eastern District of Pennsylvania.
† See The Ottawa, 3 Wallace, 268

*shall never carry*," an exception justified by experience, which showed that it caused many collisions, arising from mistaking it for a light on shore; the case of "*Propeller Monticello* v. *Mollisson*,"* being an example. There the steamer was running on a course a mile wide of the schooner, but mistaking her mast-head light for a light-house, she steered with such accuracy of aim as to strike the schooner exactly and with such force as to sink her.

By the customs and rules of navigation every vessel at anchor in a harbor or roadstead is bound to keep a light suspended on board. But previous to the passage of this act sailing vessels on the rivers and on the ocean were not bound by any law or custom to carry lights. The case of *The Osprey*, cited by the appellant's counsel, applies to vessels meeting in the same line, where one party can plainly see the other and yet keeps dark. But where the danger of collision is the consequence of a sudden and unexpected change of course, which produces a sudden peril and leaves no time to the sailing vessel to display a light before a collision—or do more than shout—where the steamboat, if it had had a sufficient lookout, might easily have avoided the collision, it has no right to complain or demand that the damages should be divided as where both are in fault.

The exceptions to the master's report are without just foundation after the Circuit Court had reduced the damages to the amount of $513.

DECREE OF THE CIRCUIT COURT AFFIRMED.