McCABE and others *v.* OLD DOMINION STEAM-SHIP Co.

*(District Court, D. Delaware.* June 7, 1887.)

COLLISION — BETWEEN STEAMER AND SAILING VESSEL — IMMODERATE SPEED — LOOKOUT.

A collision occurred a short distance south of the Scotland light-ship, off New Jersey, during a dense fog, between the steam-ship Seneca, outward bound on a S. ¼ W. course, and the schooner William S. McCabe, inward bound on a N. to N. ½ E. course. The S. was proceeding at the rate of above seven miles an hour, was blowing her fog-whistle every minute, and had a proper lookout forward. The McC. was sailing at a speed of two and one-half or three miles an hour, and had no lookout forward. Her mate stood on the forward part of the poop, about 75 or 80 feet aft from the stem, from which point the view forward was unobstructed, and was engaged in the triple duty of lookout, blowing the fog-horn, at intervals of a minute or minute and a half, and of navigating the vessel. The S.'s fog-whistle was heard on board the McC. three or four minutes prior to the collision, but the latter's fog-horn was not heard on the S. The S. was sighted at from 300 to 400 yards off. The McC. was sighted from the S. about 300 feet away. The S. immediately ported her helm, and stopped and backed her engines. The master of the McC. mistook the course of the S., and starboarded his helm, turning his vessel across the S.'s course. The McC. was struck between the fore-rigging and her starboard cat-head, and sank in a few minutes. *Held,* that the S. was in fault for proceeding at an immoderate speed in a fog; but that the McC. was in fault for not having a properly stationed lookout forward; and that the libelants having failed to prove that the absence of such lookout did not contribute and could not have contributed to the disaster, there must be a decree for only half damages, with costs, for the libelants.

In Admiralty.

*Charles Gibbons, Jr.*, for libelants.

*Owen & Gray, Frank D. Sturgis*, and *Bates & Harrington*, for respondents.

WALES, J. At five minutes before 6 o'clock, on the morning of the seventh of May, 1885, the three-masted schooner William S. McCabe, while sailing from the Rappahannock river, Virginia, to the port of New York, laden with a full cargo of grain, when about three miles off the New Jersey coast, and a short distance south of the Scotland light-ship, came into collision with the steam-ship Seneca, belonging to the Old Dominion Steam-Ship Company. The schooner was struck somewhere between the fore-rigging and her starboard cat-head, and sank in a few minutes. The McCabe hailed from Wilmington, Delaware; was 105 feet long, and 180 tons register. The Seneca was running on one of its regular trips from New York to Norfolk. She is an iron built ship, 290 feet in length, of 2,700 tons register, and her engine, when fully developed, will run up to 2,200 horse-power. The owners of the schooner

and her cargo sue for damages, alleging that the disaster was caused solely by the negligence of the persons who were in charge of the Seneca, especially in running her at an excessive rate of speed in a dense fog. The respondent admits a speed of seven miles an hour, but contends that the Seneca's movements were under full control, and that the steamer ported her helm, stopped and backed, as soon as the schooner was sighted, and would have cleared the schooner had the latter kept her course, and not changed her helm to starboard. The schooner is also charged with not having a proper lookout, failing to blow a fog-horn, and sailing with undue speed.

The following facts are admitted: (1) The morning was very foggy; (2) the wind was east, and blowing 19 miles an hour; (3) the schooner's helm was put hard a-starboard before the collision, and the steamer put her helm hard a-port; (4) that the vessels lay together five or six minutes, during which time the schooner's crew were taken aboard of the steamer.

The words "very foggy" do not convey the most accurate description of the density of the atmosphere before and at the time of the collision. The fog was unusually thick; so dense that objects could not be seen through it, according to some of the respondent's witnesses, further off than 300 feet, while others estimate the greatest distance at not more than 50 feet. Capt. Williams, who was the master and a part owner of the schooner, states that, up to 8 o'clock on the night of the 6th, he had been carrying full sail, the wind blowing quite a fresh breeze. He judged himself, at that time, to be about the Highlands, may be varying eight miles from the reckoning, when he began to stow away all his light sails as fast as he could, and put his vessel in an easy position for the night, or as long as it stayed thick. On the morning of the seventh the wind had moderated, and was blowing from the E. N. E. to E., by N. From 3 o'clock until the time of the collision the schooner was heading from N. to N. by ½ E., with a speed of one mile and a half, under spanker, mainsail, foresail, forestaysail, and jib. The wind was not steady, but puffy, and the vessel was not steering very well. He had been on deck since 12 o'clock the day before, with the exception of meals, and one hour for rest in the cabin during the night. The mate was on the forward part of the poop, blowing the fog-horn at intervals of a minute or a minute and a half. The vessel being straight, and with very little sheer, he could see over the bow-rails, as well from there as from any part of the ship. An able-bodied seaman was at the wheel, and the steward was forward preparing breakfast. The fog-whistle of the steamer was heard on board the schooner three or four minutes before the collision. The captain then took the wheel to steady the vessel on her course. The steamer was sighted at from 300 to 400 yards off, and appeared to be heading about S. ¼ E., varying a little, first to leeward, next to starboard, and then coming right on. The schooner was kept on her course until the steamer was within 75 or 100 feet off, on her starboard bow, when Capt. Williams put his helm hard a-starboard.

The Seneca had left New York on the afternoon of the 6th, but, on account of the increasing fog, came to anchor just outside the Narrows,

where she remained until 4:30, on the morning of the 7th, when the weather began to clear, and she proceeded on her voyage. When off Sandy Hook the weather again set in thick and foggy, the steamer was slowed down, and the fog-whistle sounded. After passing Scotland light-ship, the steamer was put on her regular course, S. ½ W., and kept on that course until her helm was put hard a-port, just before the collision. Fog-whistles of a steamer ahead, and also of a steamer astern, were heard at different times, but, with these exceptions, no whistles or fog-horns were heard. Capt. Walker, of the Seneca says that he was standing on the bridge with his second officer. One quartermaster and two sailors were at the wheel, and a lookout was stationed forward. A dense fog had been prevailing for three-quarters of an hour, and the fog-whistle was sounding every minute. The steamer was making between six and seven miles an hour. His attention was first directed to the schooner by the lookout reporting, "Sail right ahead, a little on the port bow," and immediately the order was given hard a-port, and signals made to stop and back. He saw the schooner as soon as she could be seen, about 300 feet away. He told the second officer, Leyland, "We are going all clear." Leyland replied: "No, captain, that fellow has put his wheel hard a-starboard." "We were going away from her, and she kept following us up, and ran into us." When the collision occurred he thought the steamer had come to a stand-still, because she stopped right there, and the men were taken out of the schooner.

Capt. Walker contends that the schooner had three chances to keep clear of the steamer,—"*First*, if he had blown a fog-horn, we would have heard it, and kept away from him; *second*, if he had kept his course, we would have gone all clear; and, *third*, if he had ported his wheel the collision would have been prevented."

This is the substance of Capt. Walker's statement, which is somewhat modified by the testimony of Leyland, and by that of Bensen, the lookout. The former says that he and the captain saw the schooner almost simultaneously, a few moments before she was reported by the lookout. Leyland's opinion is that, if the schooner had kept on her course, as he first saw her, she would have passed all clear, except that her spanker boom might have scraped the steamer a little aft, (R. t. 85–87;) and Bensen says that the steamer was going ahead at the time she struck the schooner.

A great deal of testimony has been submitted by the respondent to prove that the steamer was running at moderate speed when the schooner was first sighted, and that her movements were so far under control that she could be stopped within the distance of her own length. Interesting and instructive experiments have been made on board the Seneca, since the collision, by scientific and practical engineers, to demonstrate the fact that, when going at seven miles an hour, with her engine making thirty-four revolutions per minute, she could be and was stopped within that distance. Conceding this to be proved, the question still remains, what was the steamer's actual speed during the 55 minutes before the collision? The inquiry is, not what could or can be done, with the engine slowed down to 34 revolutions, with every officer and man at his

post, prepared to act on the instant, and to quickly execute every order, but what was actually done between 5 and 6 o'clock on the morning of the seventh of May. The testimony of the respondent's witnesses, as to the speed of the Seneca during that period, is evasive and unsatisfactory. Capt. Walker is the only person, who was on deck at the time of the accident, who is willing to swear that the Seneca's speed was not more than seven miles an hour. Leyland, the quarter-master, one of the sailors at the wheel, and the look-out, each having the same opportunity of estimating her speed as the captain had, decline to express any opinion on the subject. Leyland says: "I don't know what she was doing; whether she was going full speed, or half speed or what." The chief engineer testifies that she was slowed down to 34 revolutions per minute, but the entries on his log, made at the time, show that for the 55 minutes preceding the collision the engine averaged 51¼ revolutions per minute, aggregating 3,070. The maximum speed of the Seneca is 15 miles, with her engine making 60 to 61 revolutions a minute, or 3,600 per hour. Her average speed is 14½ miles. By the ship's log, the Seneca weighed anchor at half past 4, and up to 5 o'clock her engine had made 1,800, which was going at full speed. At 5:20 she was off Sandy Hook, when the weather "shut in dense fog again," and when it would have been prudent to decrease her speed; but the engineer's log shows a diminution of barely nine revolutions to the minute.

Now, allowing 60 revolutions a minute, for the first 20 minutes after 5 o'clock, the engine made 1,200 revolutions during that time; and, deducting this number from 3,070, the remainder is 1,870, which, divided by 35, the number of minutes elapsing from 5:20 to the time of the collision, gives an average of 53 revolutions per minute; thus showing that the Seneca must have been driving through the fog at an immoderate and dangerous speed. The only comment on these entries on the engineer's log, made on behalf of the respondent is, that they were, made informally, and may be inaccurate. It would seem unnecessary to pursue the inquiry on this point any further; for, if the engineer's record approximates to any degree of accuracy, the calculation, based on the entries, gives to the steamer a materially increased rate of speed over that admitted by the respondent. The entries cannot be understood, and it is impossible to explain them, or any other theory than that the steamer's speed was greatly over one-half of her maximum rate; and, as their correctness has not been successfully impeached, the proof is conclusive that she must have been running at not less than 10 miles an hour when the McCabe was first sighted.

By article 17 of the international rules it is made the duty of a steamship to keep out of the way of a sailing vessel, when both are proceeding in such directions as to involve risk of collision; and article 13 requires that every ship, whether a sailing-ship or a steam-ship, shall, in a fog, mist, or falling snow, go at a moderate speed. What is undue speed must depend upon a variety of conditions. No formula has been established by which to determine the lawful rate of speed in a fog. The general rule is that a steam-ship should always be under such control as to be stopped and reversed within the distance at which an ap-

proaching vessel can be seen. In cases of collision, to exonerate a steamer it must be shown that she had taken every reasonable precaution to meet any emergency which might arrive, and that she was not guilty of the want of ordinary care, caution, or maritime skill. *The Nacoochee*, 28 Fed. Rep. 462; *The Colorado*, 91 U. S. 692.

In *The Nacoochee*, where a vessel could be seen only 200 yards off, six knots an hour was held to be in excess of the moderate speed required by the rule. In *The Colorado*, a propeller was running, in a fog, at five or six miles an hour, and was held guilty of negligence in not slackening down to a slower rate.

In *The Pottsville*, 12 Fed. Rep. 633, a speed of even four miles an hour by a steam-ship in a dense fog, was considered excessive; and it was also held that when steaming on one of the most frequented parts of the Atlantic Ocean, under such circumstances, no greater speed should be allowed than is actually necessary to afford steerage way.

In *The Pennsylvania*, 19 Wall. 133, this subject of moderate speed was most fully considered. That was the case of a collision which occurred in a very dense fog, between a sailing bark and a large steamer, about 200 miles from Sandy Hook, and therefore in the track of inward and outward bound vessels. The bark was moving at about the rate of a mile an hour. The steamer was going at the rate of seven knots an hour, which was held to be excessive. The court say that "moderate speed" is not precisely definable. "It must depend upon the circumstances of each case. That may be moderate and reasonable in some circumstances which would be quite immoderate in others. But the purpose of the requirement being to guard against danger of collisions, very plainly the speed should be reduced as the risk of meeting vessels is increased."

In the case of *The Europa*, Jenk. Rule Road, 52, it was said by the privy council:

"This may be safely laid down as a rule on all occasions, fog or clear, light or dark, that no steamer has the right to navigate at such a rate that it is impossible for her to prevent damage, taking all precautions at the moment she sees danger to be possible; and if she cannot do that without going less than five knots an hour, then she is bound to go less than five knots an hour."

The admitted speed of the Seneca is seven miles. The evidence proves that it must have been greater, though it is impossible to fix the exact rate. Enough has been shown to condemn her for negligence in this respect, and to make her *prima facie* responsible for the collision.

But were those in charge of the schooner guiltless of any contributory fault? The positive assertion by the crew of the McCabe, that her fog-horn was blown, outweighs the negative testimony of those on board of the Seneca. It is not unusual for the same sound to be heard faintly, if at all, for a short distance, in one direction, and with more or less force for a longer distance in another direction. Practical tests have proved that fog-horns are not infrequently unreliable signals, and that they cannot be depended on in every condition of wind and atmosphere. It may therefore be perfectly true that, although the mate of the schooner blew a fog-horn continuously, and at proper intervals, it was not heard on board of the Seneca. Nor does it appear from the evidence that the

schooner was sailing at more than moderate speed. She was heavily loaded, and carrying only her lower sails. Her progress through the water did not probably exceed two and a half or three miles an hour,— a little more than enough to give her good steerage way; and, in view of the difficulty of regulating the speed of a sailing-vessel, when making any headway at all, this cannot be considered as excessive. Neither would the starboarding of her helm, just before the collision, have been a fault, if it could be made clear that the change was made *in extremis,* and in a condition of impending peril to which she had not been brought by any act or neglect of her own. And this brings up the only really embarrassing question in this case, to-wit, did the want of a proper lookout on board of the schooner contribute to the accident?

It is admitted—for the fact is beyond dispute—that the schooner had no lookout on the top-gallant forecastle; but it is contended that the mate, who was acting in that capacity, was standing on the forward part of the poop deck, commanding a sufficiently advantageous position for a perfect view of all that could be seen, and that the steamer was seen as soon as possible; that the attention of those on board had been called to the proximity of the steamer by hearing her whistle, and it was not likely they would subject their lives to hazard by neglecting to maintain a vigilant watch; that the schooner being obliged to hold her course, and, her officers having been in possession seasonably of all the information a lookout could have given, the services of the latter were not indispensable. This reasoning is plausible, but it assumes as a fact what the evidence leaves doubtful and undetermined, namely, that, had a lookout been properly stationed on the forward part of the McCabe, he could not have given earlier and more accurate information of the approach and course of the Seneca. The mate was standing about 75 feet from the bow, engaged in the triple duty of lookout, blowing the foghorn, and navigating the vessel. It was his watch, he had charge of the vessel, and the captain was assisting him. L. t. 61.

In *The Northern Indiana,* 3 Blatchf. 92, it was held that "the want of a lookout, detailed and stationed for the constant performance of that specific duty, is of itself a circumstance of strong condemnatory character, and exacts in all cases from a vessel neglecting it clear and satisfactory proof that the misfortune encountered was in no way attributable to the misconduct in that particular."

In *The Great Republic,* 23 Wall. 20, it was said by the court:

"In any case of collision, whenever it appears that one of the vessels has neglected the usual and proper measures of precaution, the burden is on her to show that the collision is not owing to her neglect."

And in *The Pennsylvania, supra,* Mr. Justice STRONG, speaking for the court, said:

"It must be conceded that, if it clearly appears the fault could have had nothing to do with the disaster, it may be dismissed from consideration. * * * But when, as in this case, a ship at the time of the collision is in actual violation of a statutory rule intended to prevent collisions, it is no more than a reasonable presumption that the fault, if not the sole cause, was at least a contributory cause of the disaster. In such a case the burden rests upon the ship of showing, not merely that her fault might not have been one

of the causes, or that it probably was not, but that it could not have been. Such a rule is necessary to enforce obedience to the mandate of the statute."

In *The Ottawa*, 3 Wall. 273, "proper lookouts," as required by article 24, are described as "competent persons, other than the master and helmsman, properly stationed for that purpose on the forward part of the vessel. * * * Lookouts stationed in positions where the view forward, or on the side to which they are assigned is obstructed, either by the lights, sails, rigging, or spars of the vessel, do not constitute a compliance with the requirements of the law; and, in general, elevated positions, such as the hurricane deck, are not so favorable situations as those more usually selected on the forward part of the vessel, nearer the stem."

In *The Excelsior*, 12 Fed. Rep. 195, following *The Farragut*, 10 Wall. 334, and *The Fannie*, 11 Wall. 238, the court held that "the want of a proper lookout, it is true, is immaterial, if it in no way contributed to the accident." But the question in that case, as here, was one of fact, whether the lights visible from the one vessel to the other were in fact correctly seen and noted; and the court say that "the position of the captain of the schooner abaft of the wheel cannot be admitted for a moment as a proper position for a lookout, when sailing full and free with a strong wind, and, in case of a conflict of testimony observation reported from such a position, must be deemed partial, interrupted, and incomplete, and entitled to far less weight than that of a lookout properly stationed." And, on the evidence, the court found it "impossible to say that the schooner's change of course did not contribute to the collision."

So, after a careful examination of the testimony in the case at bar, it is impossible to say, with any degree of certainty, not probability, that a lookout on the McCabe, stationed 75 to 80 feet forward of the position occupied by the mate, with his whole attention directed to watching and listening for the appearance and sound of an approaching steamer, could not have reported the Seneca sooner than she was seen from aft. Capt. Williams, unfortunately, mistook the exact course of the Seneca. A proper lookout might have prevented this mistake. It is by no means certain that he could not and would not have done so. The Seneca had ported, and was swinging around to leeward, when the captain of the McCabe, in the confusion of the moment, and from the want of information which might have been imparted by a lookout properly stationed, starboarded his wheel, and threw his vessel across the bow of the steamer. Had he kept the McCabe on her course, he would probably have gone clear. He would certainly have escaped had he ported instead of starboarding, as the steamer's course at the moment of collision had been changed two points from S. ½ W. to S. S. W. ½ W It may be admitted that the Seneca was guilty of the greater fault in running with such reckless and unwarrantable speed, but this does not excuse the absence of a proper lookout on the McCabe.

Since the libelants have failed to prove that such absence did not contribute, and could not have contributed, in any degree, to the disaster, there must be a decree for only half damages, with costs for the libelants, and an order of reference to ascertain the amount.