## THE TILLICUM.

(District Court, W. D. Washington, N. D. October 22, 1914.)

### No. 4730.

**1. Collision (§ 83*)—Steam Vessels Meeting—Fog.**

A tug, with a barge on the side extending ahead, and a meeting steamship, came into collision in Puget Sound in the early morning in a dense fog. Both were sounding fog signals. The steamship heard the tug's signal ahead, and stopped her engines for a minute, and then started ahead, but almost immediately reversed, on hearing another signal, and an alarm, which she answered. The only lookout on the tug was in the pilot house, which was at least 24 feet back from the bow of the barge. She had also stopped her engines, but both vessels were moving forward at the time of collision. *Held*, that the steamship was in fault for starting ahead without locating the whistle heard ahead, that the tug was also in fault for not maintaining a proper lookout forward, and that both were in fault for not sooner stopping their headway.

[Ed. Note.—For other cases, see Collision, Cent. Dig. §§ 156, 167, 175; Dec. Dig. § 83.*]

**2. Collision (§ 21*)—Navigating in Fog—Lookout.**

A local custom of tugs to maintain their lookouts either in or just forward of the pilot house does not excuse them for violating the law, which in general, and especially in a fog or darkness, requires all such vessels to maintain a lookout forward, whose sole duty it shall be to look and listen for other vessels; and where such rule is not observed, and a collision follows, every doubt as to the effect of the neglect will be resolved against the vessel.

[Ed. Note.—For other cases, see Collision, Cent. Dig. § 18; Dec. Dig. § 21.*]

**3. Collision (§ 77*)—Lookout—Construction of Rules.**

In view of the provision of article 29 of the Inland Rules (Act June 7, 1897, c. 4, 30 Stat. 102 [Comp. St. 1913, § 7903]) that "nothing in these rules shall exonerate any vessel * * * from the consequences of any neglect to * * * keep a proper lookout," the requirement of rule 38 of the board of inspectors that all passenger and ferry steamers shall, in addition to the regular pilot on watch, have one of the crew also on watch in or near the pilot house, cannot be construed as superseding the long-established admiralty rule requiring a competent lookout forward.

[Ed. Note.—For other cases, see Collision, Cent. Dig. §§ 140–149; Dec. Dig. § 77.*]

**4. Collision (§ 77*)—"Lookout" Defined.**

A "lookout" is a person who is specially charged with the duty of observing the lights, sounds, echoes, or any obstruction to navigation, with the thoroughness which the circumstances admit. His sole duty must be that with which he is charged, and he cannot divide this responsibility with the duties of master or with any other person.

[Ed. Note.—For other cases, see Collision, Cent. Dig. §§ 140–149; Dec. Dig. § 77.*

For other definitions, see Words and Phrases, First and Second Series, Lookout.]

In Admiralty. Suit for collision by the Inland Navigation Company, as owner of the steamship Rosalie, against the towboat Tillicum; the Stimson Mill Company, claimant and cross-libelant. Decree against both vessels.

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

Bronson & Robinson, of Seattle, Wash., for libelant.

Hughes, McMicken, Dovell & Ramsey, of Seattle, Wash., for claimant and cross-libelant.

NETERER, District Judge. The steamship Rosalie, a vessel of 318.51 gross tonnage, bound from Bellingham to Seattle, at about 5:15 a. m. on the 8th day of April, 1911, collided with the towboat Tillicum, a vessel of 116 tons and 87 feet in length, while proceeding from the Standard Oil dock, in Seattle, to Ballard. The Tillicum had lashed to her side a barge, 28 feet wide and 100 feet long, on which was loaded two oil tank cars. The Rosalie was owned by the Inland Navigation Company, a corporation, and the towboat Tillicum by the Stimson Mill Company. A libel and a cross-libel were filed by the respective parties to recover the damages sustained to their respective vessels.

, A dense fog prevailed in the vicinity of the place of collision. The usual speed of the Rosalie was about 9½ knots per hour. She passed West Point Lighthouse about 5:05 a. m. At that time a very light fog prevailed, and the light at West Point was plainly visible. She was giving her regular fog signals, one prolonged blast of her whistle, at the usual intervals. About three minutes after passing West Point her lookout reported one whistle on the port bow, which was also heard by the mate then on duty in the pilot house. The engine was stopped and the vessel drifted about a minute, and hearing no further response to her whistle she started ahead. Then another whistle was heard, followed by a danger signal from the tugboat, which was answered by a like signal from the Rosalie. At this time the lights were seen a short distance ahead. The Rosalie, after giving the signal to go ahead, almost instantly gave the order to reverse. The tug Tillicum proceeded on her course in a thick fog which was prevailing. She gave her fog signals at the regular intervals, and as she proceeded along under Magnolia Bluff in the vicinity of Four-Mile Rock she slowed down to about three miles an hour and endeavored to locate her position by the echoes from the bluff. After proceeding at this speed for about five minutes, having heard no whistle from other vessels, she got an echo of a long whistle from some object ahead of her. She immediately stopped her engine and drifted until her next whistle was given, when the echo from ahead was repeated, and also a danger signal immediately followed, and her engine was thereupon reversed. While the vessels were in this position, the collision occurred. At the time of the collision, A. W. Anderson was master and pilot of the tugboat. Captain Charlesworth was acting as lookout from the pilot house. The scow's bow was from 12 to 30 feet forward of the bow of the tug. The bow of the tug was at least 12 feet forward of the pilot house.

[1, 2] It is contended on the part of libelant that because the tug Tillicum had no lookout, and because she did not stop and reverse in time, and because she was carelessly navigating, she is liable for the damage which was occasioned; while it is contended by the claimant and cross-libelant that the Rosalie was at fault: First, in navigating

at an excessive rate of speed; second, in navigating without due caution after hearing a steam vessel forward of her beam, whose course and position were not ascertained; and, third, in failing to give proper signals when it became apparent that the course and intention of the vessel approaching was not understood. The claimant urges that, while it did not have a lookout upon the bow of the tug, the better point of observation was in the pilot house, and that, even though the pilot rules would ordinarily require the lookout to be on the bow of the boat, yet the custom in the operation of tugboats in and about the waters in which the collision occurred is for the lookout to be stationed just forward of the pilot house, or in the pilot house.

It is immaterial what the custom in the operation of the boats is, if the custom is contrary to the law. If a custom could obtain over the law, navigators could very readily overcome an act of Congress by agreeing upon a rule and adhering to it for such a time as to develop a custom. Such cannot be the law.

"The statement that it is not customary for tugs to maintain a more vigilant lookout than this tug had is immaterial. The law determines their duty in this respect, and they cannot avoid it without becoming responsible for the consequences." The George W. Childs (D. C.) 67 Fed. 272.

It has, in admiralty, long been the established rule of due care that vessels navigating in a fog or in the nighttime shall have a competent lookout.

"Steamers are required to have constant and vigilant lookouts stationed in proper places on the vessel, and charged with the duty for which lookouts are required, and they must be actually employed in the performance of the duty to which they are assigned. They must be persons of suitable experience, properly stationed on the vessel, and actually and vigilantly employed in the performance of that duty. Proper lookouts are competent persons other than the master and helmsman, properly stationed for that purpose, on the forward part of the vessel; and the pilot house, in the nighttime, especially if it is very dark and the view is obstructed, is not the proper place." The Ottawa, 3 Wall. 269, 18 L. Ed. 165.

[4] A lookout is a person who is specially charged with the duty of observing the lights, the sounds, the echoes, or any obstruction to navigation, with that thoroughness which the circumstances admit. His sole duty must be that with which he is charged, and he cannot divide this responsibility with the duties of master or those of any other person about the ship. The J. C. Ames (D. C.) 121 Fed. 918. And it is the duty of the courts charged with admiralty jurisdiction to give the fullest effect to such duty, when the circumstances are such as to call for its application, and every doubt as to the performance of the duty, or the effect of nonperformance, should be resolved against the vessel in the fault, until the contrary is shown by the testimony. The Ariadne, 13 Wall. 475, 20 L. Ed. 542; Wilder's Steamship Co. v. The Low, 112 Fed. 172, 50 C. C. A. 473; The Hypodame, 6 Wall. 216, 18 L. Ed. 794; The Genesee Chief v. Fitzhugh, 12 How. 443, 13 L. Ed. 1058.

[3] Rule 38 of the general rules and regulations prescribed by the board of supervising inspectors, authorized under Rev. Stat. § 4405 (Comp. St. 1913, § 8159), provides:

"All passenger and ferry steamers shall, in addition to the regular pilot on watch, have one of the crew also on watch in or near the pilot house, and this rule applies to all steamers navigating in the nighttime."

This rule, it is contended, applies to the instant case, and that under it no question could arise as to the sufficiency of the lookout.

Article 29 of the regulations for preventing collisions upon harbors, rivers and inland waters (30 Stat. p. 102) provides:

"Nothing in these rules shall exonerate any vessel, or the owner or master or crew thereof, from the consequences * * * of any neglect to keep a proper lookout, or of the neglect of any precaution which may be required by the ordinary practice of seamen, or by the special circumstances of the case."

I do not think that it can be seriously contended that it was intended to supersede the long-established admiralty rule requiring a competent lookout and that he shall be placed in the forward part of a forward moving vessel, and the adoption of article 29 by Congress would seem to remove all doubt. The further contention that a person could see and hear better from the pilot house, because of its elevated position, than from the bow of the vessel, I think, is answered by the testimony in this case, which shows that the fog was general. If the testimony should disclose that the fog bank lay near the water and that the pilot house extended above the fog, the contention might have some force; but under the testimony the court must find that a person could see no farther into the fog 12 or 15 feet above the water than he could 4 or 6 feet. The bow of the scow, being some distance forward of the bow of the boat, placed the master when in the pilot house at least 24 feet back from the bow of the scow, and possibly 42 feet, depending upon the testimony adopted as correct; and the court cannot say that in a dense fog, such as this was, the lookout could have a better point of observation from the pilot house than from the bow of the boat. I think that in the towing of this scow, the lookout should have been stationed as far forward on the sailing craft as possible. The tug with its tow was a craft capable of committing injuries, and its size or shape can make no exception to the rule requiring a lookout.

"If tugs will go about the harbor without lookouts, they may not expect that the court will conjecture nicely what would have happened if the lookout had been in his place, doing his duty, when the collision occurred." The Arthur M. Palmer (D. C.) 115 Fed. 417.

The safety of life and property requires that a tug, in towing a scow in the manner shown, with the bow of the scow from 12 to 30 feet forward of the bow of the tug, in a dense fog, must have a lookout stationed farther forward than in the pilot house on the tug. In a dense fog a short distance to the eye or ear may mean much, and a few feet might save many lives or much property. Courts must, therefore, in a harbor where many vessels may be afloat, rigidly enforce the safety provisions of law or admiralty rules.

Article 16 of regulations for sailing crafts upon inland waters (30 Stat. p. 99 [Comp. St. 1913, § 7889]), provides:

"A steam vessel hearing, apparently forward of her beam, the fog signal of a vessel, the position of which is not ascertained, shall, so far as the cir-

cumstances of the case admit, stop her engines, and then navigate with caution until danger of collision is over."

I think it may be fairly assumed that the claimant, when it heard the echo of the object forward, did stop its engine and navigate with caution; but I am not prepared to say that the echo was heard or the engine stopped and reversed in time to stop the forward motion of the tug. The libelant upon hearing the whistle, immediately stopped its engine and proceeded with caution, but I think was not warranted, under the circumstances, in starting forward again at the time that it did without first locating the whistle that had been heard. The Hypodame, 6 Wall. 216, 18 L. Ed. 794. And while the forward motion was only three or four revolutions of the engine, yet it was of sufficient force to add the momentum which the Rosalie then had to the speed that had been given prior to the stopping of the engine, and the reversing of the engine after the alarm signal was given was too late to stop the forward movement of the boat prior to the collision. I believe, from the testimony in this case, that the engines of both crafts were reversed, but that they had not operated for a sufficient length of time to stop the forward movement of either of the crafts, and that both boats were still going forward at the time of the collision.

"The liability for damage is upon the ship or ships whose fault causes the injury; but when, as in this case, a ship at the time of a collision is in actual violation of a statutory rule intended to prevent collisions, it is no more than a reasonable presumption that the fault, if not the sole cause, was at least a contributing cause, of the disaster. In such a case the burden rests upon the ship of showing, not merely that her fault might not have been one of the causes, or that it probably was not, but that it could not have been." The Pennsylvania, 19 Wall. 125, 22 L. Ed. 148.

This rule applies where a proper lookout is not provided (The George W. Childs, supra; The Arthur M. Palmer, supra; McCabe v. Old Dominion Steamship Co. [D. C.] 31 Fed. 234; The Lyndhurst [D. C.] 92 Fed. 681), as well as violations of other recognized rules of navigation.

"It is * * * claimed that, even if the Selja was at fault in not obeying rule 16, such fault was not a contributing cause of the collision. The law is that * * * she must show, not only that probably her fault did not contribute to the disaster, but that it could not have done so." The Beaver (D. C.) 197 Fed. 866.

Both of these vessels were moving vessels. I think both were at fault. The Tillicum did not have a proper lookout, and the Rosalie did not navigate with due caution after hearing a steam vessel forward of her beam. Both vessels, having violated recognized rules of navigation, and not having shown that such fact did not contribute to the disaster, must be held to have contributed to the collision.

The damage to the Rosalie is shown to be $5,116.12; to the Tillicum and scow, $597.30—a total loss of $5,713.42, which should be equally divided. A decree may be presented for libelant in the sum of $2,-856.71; each party to pay one-half the costs.