THE MEDFORD.

THE S. S. THOMAS H. BARRY.

TRAWLER MEDFORD, Inc., v. UNITED STATES.

UNITED STATES v. TRAWLER MEDFORD, Inc.

JOHANNSSON v. UNITED STATES.

Nos. A–17668, A–17728, A–17675.

District Court, E. D. New York.
April 30, 1946.

Bigham, Englar, Jones & Houston, of New York City (Andrew J. McElhinney, of New York City, of counsel), for Trawler Medford, Inc., and Gudmunder Johannsson, Master, and Gunnlaugur Jonsson, Seaman, of Motor Fishing Boat Medford.

J. Vincent Keogh, Esq., U. S. Atty., of Brooklyn, N. Y. (Edwin Longcope, Sp. Asst. to U. S. Atty., of New York City, and Edward R. Downing, of Brooklyn, N. Y., of counsel), for United States of America.

BYERS, District Judge.

On October 21, 1945, at 10:38½ or 10:39 a. m., E. W. T., the steel trawler Medford out of Boston was cut down and sunk by the steamship Thomas H. Barry, and the lives of seven of her crew were lost. A heavy fog prevailed at the place of collision, which was about 125 miles easterly of Nantucket Light, 40° 41′ north latitude, and 67° 18′ west longitude, in the vicinity known as the George's Bank.

The above causes are the result of that episode; in the first the owner of the vessel sues, in its own behalf and as bailee of the cargo, etc., the United States of America as owner, operator and in control of the Thomas H. Barry. The second is by the Government against the libelant in the first, to recover for damages sustained to the bow of the Barry; the third is by the Master of the Medford, and by a seaman, to recover damages for personal injuries suffered by them in the collision. These causes were consolidated for trial and decree.

The showing for the Barry is such a sorry one that no issue is made as to the liability of the Government, and the controversy is narrowed down to an effort to demonstrate that half damages should be assessed against the libelants in the first and third causes, and against the respondent in the second, by reason of faults attributed to the Medford according to the Government's assertions of the situation as revealed in the evidence.

### Findings

1. The steamship Barry is a United States army transport, and was engaged as a public vessel carrying 3,000 troops for replacement in Europe, bound from New York to Le Havre, of 11520 gross-6449 net tonnage; her dimensions are 508′ by 77.9′ by 39′ in depth. She had a straight stem.

She had twin screws actuated by turbo electric engines of 8,000 horsepower each, and was capable of a top speed of 21 knots.

2. On the morning of October 21, 1945, the Barry was traveling at full speed, namely, 18 knots, at 130 engine revolutions per minute; top speed would have required 144 revolutions. (Mathematically computed, the speed was 18.9.)

3. She was on a course of 87° true, which she had held for not less than two hours prior to 10:39 a. m.

4. The speed of the Barry was not altered at any time after she entered the bank of fog in which a collision with the trawler Medford occurred, until she was about 200 to 300 feet from the latter, when the signal was given from the bridge to stop the engines, and in less than half a minute that order was followed by one to reverse.

5. The forward motion of the Barry was not arrested by the last-mentioned signal until she had struck the Medford on its starboard side at the pilot-house, at an angle of about 90°, amidships, and penetrated into the Medford about two-thirds of its width.

6. The bow of the Barry remained in the Medford for about two or three minutes, during which interval the latter remained afloat; then the Barry, under the impulse of the reverse engine movement which was not countermanded, backed out and away from the Medford, which at once

sank and became a total loss, carrying down a cargo of some 70,000 pounds of fish, and all the personal effects of her officers and crew.

7. Seven of the crew of the Medford lost their lives through drowning, as the result of the matters related in the foregoing finding.

8. The Barry observed the bank of fog in which the collision occurred, at 10:15 a. m., at which time the Master was so notified, and in response he came to the bridge.

9. The said fog bank lay about dead ahead of the Barry.

10. The course of the Barry was not altered, nor was her speed diminished up to the time of the collision.

11. The Barry was equipped with radar which "is the best anticollision device yet perfected" (Electronic Navigational Aid published by the United States Coast Guard —U. S. Government Printing Office 1945).

12. The radar equipment (Navy Model SQ) on the flying bridge was in unimpaired operable condition and was capable of picking up the Medford at a distance of 38 miles, and if a sufficient number of bearings had been taken, her track (and heading) could have been ascertained.

13. The radar equipment could have been put into operation in 1½ minutes.

14. If the radar had begun to function at 10:25 a. m., the succeeding interval of about 13½ minutes would have been more than ample in which to apprise the Barry of the position and heading of the Medford, and to have enabled the Barry to avoid any physical contact with the Medford.

15. The Barry carried two U. S. Navy radar men, i. e., Lewis, Radarman 3/C who had been attached to the Barry since June 29, 1945, and Young, Radarman 3/C, the length of whose service on this ship does not appear.

16. Neither of these men was summoned to man the radar equipment at any time on this morning prior to the collision, nor was any effort made of any kind by any one to operate the said equipment.

17. The Barry entered the fog bank at about 10:37½ a. m. at the speed above stated.

18. In the vicinity of the collision, the fog was thick and visibility did not exceed 200 feet.

19. The Barry sounded her whistle twice before the collision; the first blast was delayed and smothered by the presence of water in the whistle and was less in volume than a clear blast, and was sounded about when the Barry entered the fog; the second blast was at an interval of about one minute and was in normal volume and preceded the collision by a matter of seconds.

20. The Barry was being steered by automatic equipment known as the "iron mike" during the morning in question and at the moment of impact, although a quartermaster stood at his post and could have taken over in a few seconds, had hand steering been initiated at any time after the presence of the fog bank became known.

21. The Barry had no lookout on duty at her bow between 10:15 a. m. and the collision, but did have a lookout posted on her flying bridge (which was about 110 feet aft from her bow) during this interval, who failed to report the fog bank to the bridge.

22. The following deck officers were on duty and functioned variously from 10:15 a. m.:

Erickson, Captain, came to the bridge at 10:15 a. m. and remained there during all critical times.

Berman, 3d mate, 8-12 watch, in charge of navigation, on the bridge.

Tiemann, Junior 3d mate, called Junior 3d Officer in the Army Transport Service, same watch as Berman, on the bridge. His duties were to take care of the log, see that there was a proper lookout and check the course with the compass.

Brown, First Officer, 4-8 watch, navigating officer, was in the chart room and went to the wheelhouse at the time of collision, having heard two blasts, as above stated, from the Barry's whistle.

Trick, Chief Officer, i. e., Executive Officer, "runs the ship", also liaison medium between commanding officer of troops on board and the ship's Master, on the bridge; he suggested the Barry's blowing her whistle "when I come up I said 'Better start your whistle going Mister' ". Came

to the bridge after 10:30 a. m. and moved thence to the forecastle head at the collision.

23. There was no stand-by order transmitted from the bridge to the engine room prior to the collision. The bridge and engine room clocks were in agreement.

24. The Medford was a steel trawler, 121′ over all, 114.7′ on the water line, 24′ in beam over all, 23′ in beam on the water line, with a depth of 11.4′, and carried a 6-cylinder diesel engine of 360 indicated, 550 actual horse power; she had two masts but no sails, and her steel bulwarks were from 3 to 4 feet high. She was equipped with radio phone, and was in all respects seaworthy.

25. She carried a crew of seventeen men, including the Master who was in the pilot-house on duty at the time; the chief engineer was in the engine room, and the cook was in the galley; the mate was not on watch but was in the pilot-house with the Master, and reported the presence of the Barry to the Captain (Johannsson) as soon as he observed her bearing down upon the Medford.

26. The Medford, being on the fishing grounds known as George's Bank about 125 miles east of Nantucket, was moving at a speed of 3 knots on a course of 187° true, with her starboard net down, trawling, i. e., she was towing her trawling net for fish. The net is 80′ by 116′, held to the ship by 7/8″ steel cables, and the weight of the entire equipment was about 4,000 pounds.

27. The net had been put down about 10 a. m. in a calm sea, with thick fog, that lightened in patches.

28. The Captain, Johannsson, was in charge of navigation, in the pilot-house, and was sounding the Medford's compressed air whistle, one long and two short blasts, as his vessel moved through the water, at intervals of not to exceed one minute.

29. Johannsson was expecting to hear the signals of other fishing vessels on these fishing grounds.

30. The said whistle was in good condition and emitted its signals in customary volume, on this morning, and its adequacy has not been put in question.

31. The mate, Munroe, was not on watch, but was in the pilot-house with Johannsson, looking out of the open window on the starboard side, just prior to the collision, as the Captain was looking out to port.

32. The speed of 3 knots was the minimum under which the Medford could maintain steering way under the conditions stated.

33. Six of the crew were on watch on deck, cleaning fish for stowing, all of whom were good experienced men.

34. The mate, Munroe, called attention to the presence of the Barry "on our starboard bow" and then Johannsson looked and saw her about abeam to starboard, coming through the fog at a distance of about 200 feet, at which time he heard a long whistle from her. At about the time the mate called attention to the Barry, the men on deck yelled out the same thing.

35. Johannsson had heard no prior whistle or signal from the Barry.

36. Johannsson swung his wheel hard over to port in the effort to bring his trawler around in that direction to receive a glancing rather than a head-on blow from the Barry, but the effort failed. Then he signaled to stop his engine. The Barry struck the Medford as has been stated, at a 90° angle at the pilot-house on the starboard side, and penetrated for about two-thirds of the beam of the trawler.

37. As the bow of the Barry was still protruding into the Medford, Johannsson called to Chief Officer Trick of the former, who was on the forecastle head, to keep the bow of the Barry in, for she was somewhat supporting the Medford in that position, and this request was repeated by Trick to the bridge of the Barry.

38. The Barry did not remain in contact with the Medford, but backed away as stated above, and the Medford straightway foundered.

39. Johannsson went down with his ship, but later came to the surface and remained afloat by the aid of wreckage, and was later picked up by one of the Barry's boats, and taken on board, where he was treated for injuries.

40. Johannsson suffered a broken leg sustained in or as a result of the collision, and his leg has since been amputated, thus giving rise to his personal cause as to which the Government seeks to visit half damages upon him as has been stated. Jonsson was also injured from the same cause.

41. The Medford could have been stopped in her forward progress through the water, under the conditions shown, in about ten seconds, at the end of which a reverse movement would have taken effect, which would have entailed a danger of fouling the cables holding the trawling net in operative condition.

42. The Barry was traveling at a rate of 30 feet a second, or 300 feet in ten seconds.

43. The Medford was traveling at a rate of 5 feet a second or 50 feet in ten seconds, or almost half her own length.

44. About six or seven seconds elapsed between the sighting of the Barry by the Medford and the collision, which was too short an interval to have enabled her to stop before being struck, since there was no change of helm at any time on the Barry.

45. The decision of Johannsson to try to turn to port in the effort to receive a glancing blow was made in extremis, and was not a fault.

46. The failure of the Medford to post a lookout at her bow was a fault, but it did not and could not have contributed to the collision.

47. The failure of the Medford to employ the fog signal of one blast followed by the ringing of a bell did not and could not have contributed to the collision.

Conclusions of Law

1. In the first and third causes, the respective libelants are entitled to the usual interlocutory decree, with costs.

2. In the second cause, the respondent is entitled to a decree dismissing the libel, without costs.

The material circumstances set forth in the findings are based upon the testimony taken at the trial and upon all the depositions.

■ Such matters as the ability of some of the Medford's crew to climb up on the Barry's anchor while the vessels were yet in contact, and the throwing of one or two lines from the bow of the Barry, and of life belts, in the effort to rescue such men as were in the water, were incidents not affecting the issues.

The faults of the Barry were so numerous and glaring as to explain the adroitness of her proctor in seeking to direct attention solely to his criticisms of the Medford, and away from the handling and navigation of the Barry, concerning which it is difficult to speak with restraint.

The City of New York, 147 U.S. 72, 13 S. Ct. 211, 37 L.Ed. 84, is no less the law, than The Pennsylvania, 19 Wall. 125, 86 U.S. 125, 22 L.Ed. 148; nevertheless, even within the stringent tests announced in the latter—assuming that it is ever intellectually possible to demonstrate what could not have happened—it is clear that the absence of a lookout, and the blowing of one long blast followed by two short ones instead of by the ringing of a bell by the Medford, played no part in this episode, as I shall hope to show.

■ The failure of the Barry to use her radar is the most serious and sinister aspect of these causes. The perfection of that device is thought to have invoked a new concept of the responsibilities attaching to vessels so equipped, touching their handling and operation in or near a fog-bound area. When The Pennsylvania, supra, was decided in 1873, the chances are that no one even speculated upon the development of a device which would have enabled that steamer, at the distance of 38 miles, to discover the presence and track of the bark which she struck and sank in a fog some 200 miles east of Sandy Hook. The fault of the latter consisted in sounding a bell which would indicate that she was not under way, instead of a fog horn which would have announced that she was. It was because of the schooner's failure to demonstrate that the steamer could not have been misled, that a half-damage decree was ordered. I cannot so read that opinion as to find refuge for the Barry in its ample folds, for the stipulated proof here is that the of-

fending ship could have informed herself of the presence and track of the Medford in abundant time to have avoided by a wide margin any danger whatever of striking her. Under such circumstances, it is impossible to yield to the argument for the Barry, that her conduct is to be condoned to any extent, in view of her failure to employ the very device which was installed to prevent a collision, and to operate which she carried two men having special rating in the U. S. Navy to attest their qualifications, and who had no duty on the ship other than to operate the radar unit.

It seems to me that it necessarily results that The Pennsylvania, supra, is not an authority controlling the decision of these causes.

Assuming the foregoing to be incorrectly reasoned, it becomes necessary to consider whether, even under so exacting a rule as that relied upon, the case for the Government is improved.

█ It is argued that the Medford contributed to the disaster by failing to sound proper signals.

Attention is called to International Rules, Art. 9, 33 U.S.C.A. § 79, Subd. (i), which provides: "In fog * * * vessels when trawling, * * * or fishing with any kind of drag net, * * * shall, if of twenty tons gross tonnage or upward, respectively, at intervals of not more than one minute make a blast; * * * each blast to be followed by ringing the bell. * * *"

That the Medford blew one long blast at proper intervals, is not questioned; her fault is said to lie in that she followed that blast with two short ones, instead of by ringing her bell.

Her Master thought that she was required to conform to Art. 15, 33 U.S.C.A. § 91, Subd. Second, par. (e), governing signals in fog: "A vessel when towing * * * and a vessel under way, which is unable to get out of the way of an approaching vessel through being * * * unable to maneuver as required by the rules, shall * * * sound three blasts in succession, namely: One prolonged blast followed by two short blasts. * * *"

He testified that such had been the unfailing practice on board fishing vessels engaged in trawling within his entire experience; this of course did not excuse him, if there is anything approaching evidence that the Barry was misled by not hearing a bell instead of two short blasts, following the one long one.

The Medford's signal was heard on the Barry, as the depositions show, and at once the signal was given to reverse: Berman said he heard the two blasts, and saw the Medford almost at once, and gave the telegraph signal to reverse the engines, all within the space of a few seconds. On cross-examination he said:

"Q. If that signal (the Medford's) had been two blasts or three blasts or five blasts or one long and two shorts or anything else, you would have still done the same thing you did; is that right? A. To my way of thinking that was the only thing I could have done, being that he was right up in front of us like that. There was nothing I could possibly have done."

This, and other testimony touching the hearing of the Medford's whistle and the response on the Barry, make it quite clear that the handling of the latter was in no wise affected by the failure of the Medford to follow her long blast by her bell, instead of by two short blasts of her whistle.

The 18-knot undiminished speed of the Barry, and her failure to disengage the automatic steering or "iron mike" on entering the fog or at any time thereafter prior to the collision, explain why this is so.

█ It is next urged that the failure of the Medford to post a lookout was such a fault as calls for the division of damages. The argument is that the Medford cannot demonstrate that the absence of a lookout did not contribute to the collision. It seems to me that the contrary necessarily follows from a consideration of all the evidence in the record, but the requirement itself is accepted as stating the rule for present purposes.

The Government cites twelve cases on the subject of the stringent nature of the necessity for the posting of a proper lookout and the high degree of responsibility

that he assumes for the correct and complete performance of his critical duties; in only one of those cases did the collision take place in a fog. The general statements contained in the various opinions on the subject are of course not to be questioned, but the facts in each case must be made clear in order that the actual decision may be understood.

The Tillicum, D.C., 217 F. 976, 977, referred to above, involved a collision in Puget Sound between the southbound steamer Rosalie (Bellingham to Seattle) and the tug Tillicum having a barge in tow alongside which projected from 12 to 30 feet forward of the tug's bow; this tow was bound from Seattle to Ballard, which lies to the north of Seattle, on the westerly side of the Sound. The tug's course is not stated, but it is inferred, from the statement in the opinion that following a danger signal from the tug, "At this time the lights were seen a short distance ahead", that the Rosalie and the Tillicum were about head and head.

Both vessels were held, the Rosalie for not navigating with due caution after hearing a steam vessel forward of her beam, and the Tillicum for not having a lookout on her own bow since the court could not say "that in a dense fog, such as this was, the lookout could have a better point of observation from the pilot house (which the Tillicum had) than from the bow of the boat".

It seems from the facts in that case that a lookout at the tug's bow could have been expected to see the Rosalie ahead at the earliest possible moment. See also McCabe et al. v. Old Dominion Steam-Ship Co., D.C., 31 F. 234, 240, not cited.

Here the northbound schooner McCabe was struck by the southbound steamship Seneca, just south of the Scotland Light Ship off the New Jersey coast, in a heavy fog. Both vessels were held, the steamer for maintaining too great a speed in a fog, and the schooner for not having a lookout forward, although her mate was acting in that capacity while navigating the vessel, standing on the forward part of the poop deck, blowing a fog horn (the schooner's length was 105 feet and the mate was about 75 feet from the bow).

The opinion shows that the vessels approached almost head and head. There is no suggestion that either vessel omitted proper fog signals.

The steamer was held for maintaining excessive speed in a fog, and the schooner also, because as the opinion states: "* * * it is impossible to say, with any degree of certainty, not probability, that a lookout on the McCabe, stationed 75 to 80 feet forward of the position occupied by the mate, with his whole attention directed to watching and listening for the appearance and sound of an approaching steamer, could not have reported the Seneca sooner than she was seen from aft."

That quotation indicates precisely why a lookout on the bow of the Medford, say 55 feet forward of the pilot-house, peering into the fog ahead, and intent upon the performance of his duties, could not have seen the Barry which was approaching from almost abeam on the starboard hand, at 18 knots, unless he had looked in that direction instead of ahead, and even then he wouldn't have seen her until she was about 200 feet away.

He could have heard her second whistle and would have been bound to look toward the source of the sound, and to report the latter at once, but I am satisfied that from only 55 feet forward of the pilot-house, and however prompt his reflexes, he could not have sung out more than one or two seconds sooner than the mate did, for the Barry's second whistle blast was about contemporaneous with her appearance to the mate and captain of the Medford.

The difference between the Barry ahead and the Barry abeam, is the difference between the cases above referred to and this.

The Barry did not crash into and sink the Medford because the latter had no lookout on her bow; the Medford did not contribute to the collision because of that deficiency, for the reason that, with the utmost diligence, no lookout could have uttered a warning which would have enabled the Medford to have stopped soon enough to avoid the mortal blow which the Barry inflicted upon her.

It appears from Johannsson's deposition that at least ten seconds would have been

required to stop her engine and actuate a reverse movement, which was three seconds more than the time required for the Barry, moving at 18 knots, to cover the 200 feet that separated the vessels when the latter was first seen from the trawler, and that omits any allowance of time for a lookout to see and report the Barry's presence. All who testified for the latter fix the sighting of the Medford as almost contemporaneous with striking her.

Whether the interval was six or eight seconds, I am persuaded that the time was too short to make any difference in the result between a possible report by a lookout at the bow, and the actual report of the mate whose view was to the starboard, and who was in fact looking in that direction.

There are matters in the depositions taken for the Barry which seem to call for brief comment: Erickson, the Master, said his engines had been working full astern for about a minute, and that his ship had practically stopped at the collision, and yet at the trial the libel in the second cause was amended by consent to increase the claim for damages to the Barry's bow, from $50,-000 to $100,000, and apparently she returned to New York because of this damage, and her repairs required a week's work. Obviously the Barry could not have "practically stopped" in view of those circumstances.

The navigation of the ship, in the critical time between 10:15 and 10:39 a. m., seems to have been a syndicated operation; although the Captain was on the bridge, it does not appear that he took command. Berman, the 3d mate, told his junior (Tiemann) as follows: "Sometime previous to coming into the fog, I *asked* Mr. Tiemann to go down and get the radar operators and told Mr. Tiemann to get the engines to stand by, call down (telephone) the engine room, put the engines on standby. * * * I don't know whether the order was finished or not."

One radar man was in the radio room, and the other was in his own cabin. The ship was equipped with a public-address system, which would have been audible to either, but it was not used. A feeble effort seems to have been made by Tiemann to accede to the request to get the radar men, by sending the lookout, Asgeirsson, below for that purpose. He reported his failure to perform his task, and that was accepted as "all right".

Trick, the Chief Officer, suggested the fog signal, as has been stated, and being on the forecastle head immediately after the collision, called back to the bridge the request of the Medford's Captain referred to above, but the prow of the Barry was withdrawn from the side of the Medford as has been stated, whereupon she sank, and it is a fair inference that, but for this, more of her crew could have been rescued than in fact were.

Asgeirsson, the lookout on the flying bridge until 10 o'clock when he was relieved for coffee, observed this fog bank, and had been instructed to keep a good lookout for fishing boats, which argues an awareness in responsible quarters of probable conditions in those seas.

This particular fog bank was not the first to be observed on that morning, as the lookout who relieved Asgeirsson briefly at about 10:20 o'clock stated before the local inspectors:

"Q. Did you report this cloud bank to the officer on watch? A. No, sir. These fog banks were going on all day long. They were coming in and out.

"Q. Did you see them before? A. Yes, sir.

"Q. About what time did you see these fog banks? A. All the time that I was on watch in the morning.

"Q. Did you see them at 8:00 in the morning? A. Yes, sir.

"Q. Where did you see them, in different spots? A. Yes, sir."

References occur throughout the depositions to the presence on deck of as many as 200 soldiers, the noises they made in imitation of fog signals—in ignorance of course of the danger so involved—and the use of the public address system during the critical period, probably for purposes not connected with the navigation of the ship. These matters point to complications necessarily present in the operation of a troop-ship, but they

are not thought to have dispensed with the necessity for the maintenance of such discipline as the conditions called for, in the light of what the record shows. After all, there were Army officers aboard, and if the troops on deck interfered with the proper navigation of the ship in the presence of fog banks, those officers could have been called upon to function. If the public address system was part of the ship's equipment to facilitate the execution of orders, it should have been put to its intended use, but that was not done until almost the instant of collision.

Nothing appears to indicate that it could not have been requisitioned as soon as the necessity for taking proper precautions attendant upon entering a fog-bound area became apparent, or should have so become to the Master of the ship. For the lamentable result of this avoidable disaster, the United States of America should be held solely answerable.

Settle interlocutory decree in accordance with the above.