In re CENAC TOWING CO., Inc., as Owner of the MV CONNIE CENAC, praying for exoneration from or limitation of liability.

In re ALFRED P. CENAC TOWING CO., Inc., as Owner of the MV CAPT. TENNER CENAC, praying for exoneration from or limitation of liability.

Nos. 6148, 6149.

United States District Court
E. D. Louisiana,
New Orleans Division.

Aug. 15, 1967.

George Matthews, New Orleans, La., for Cenac Towing Co., Inc.

Alfred M. Farrell, Jr., Karl J. M. Buhler, II, New Orleans, La., for Keystone Shipping and Shell Oil.

CASSIBRY, District Judge:

Cenac Towing Co., Inc., as owner of the Tug CONNIE CENAC, and Alfred P. Cenac Towing Co., Inc., as owner of the Tug CAPT. TENNER CENAC, each filed a petition under the Limited Liability Act, 46 U.S.C. § 183 et seq., praying for exoneration from or limitation of liability. The cause giving rise to the consolidated petitions was the alleged blocking of the channel below Southwest Pass on the night of April 9, 1963, causing the Tanker PERRYVILLE to ground. The tanker remained stranded for nine days. Heavy losses were sus-

tained by her owner Keystone Shipping Co. consisting of repair costs, transshipment of cargo, salvage and general average expenses, and by Shell Oil Company, the owner of the cargo, for its share of the general average expenses. Keystone and Shell appeared in the limitation proceedings and claimed against each tug and their respective owners for their losses. The parties agreed that the cases be consolidated for trial on the question of liability alone.

The following copy of the United States Coast and Geodetic Survey Chart No. 1272 (1963 Edition) will be helpful in following the events leading up to the PERRYVILLE grounding. It was used extensively during trial.

At the end of the Passes on the east side is a blinking red light. The station maintained by the Coast Guard (Diaphone) is also located on the east side of the Pass, approximately 500 yards above the end of the Passes, and the Pilot Station is on the east side of the Pass, approximately one mile from the end of the Pass. The Pass runs in a generally southwest direction from the Pilot Station to the end of the jetties, where the channel bends to due south. The chart of the Pass contains certain lettered blocks beginning with the letter "A" well to the south of the red light and running through the letter "P" at the Pilot Station. These blocks, of course, are for ready reference in using the chart only.

Considering all the evidence, I am inclined to agree with counsel for the claimants when he says that "in all the tortuous, winding, lower Mississippi and its passes, there is no more difficult or dangerous place than the entrance to and the exit from Southwest Pass into the Gulf." It is a difficult and dangerous Pass under favorable conditions, but at the time this accident occurred, it was extra hazardous. It was nighttime and even though visibility was not obscured by fog or rain, it was still dark and visibility was consequently greatly reduced. In April 1963, the U. S. Corps of Engineers maintained a 35 foot deep channel with an irregular width of 600 feet. The channel is confined on both sides by perpendicular dikes or wing dams extending out from the rock jetties and spaced about 1000 feet apart. The 4½ mile per hour April current sets straight out between the jetties and then spreads fan-shaped across the bar with greater velocity to the west. The major problem for a pilot is to negotiate a sharp forty-three degree turn to port to get through the jetty ends. At the Pilot Station the vessel must first get on the outgoing range of 223°. This range, after some 4000 feet, abruptly intersects with the 180° range, due south, running down the outside channel leading to the sea buoy. Because the point of intersection is right at the jetty ends, it is necessary for the pilot to put on some twenty degrees left rudder when the vessel arrives at the Coast Guard Lighthouse, about 1000 feet above the jetty ends so that the vessel would have already come about and be headed down on 180° when arriving at the intersection. Because of the dangers of the bottleneck channel, the sharp turn, and the current phenomena, the Corps of Engineers long ago promulgated a regulation prohibiting vessels, and particularly tugs with tows, from entering the jetty ends when any descending traffic is within two and one-half miles.

There is no doubt that the tugs and tow did embarrass the PERRYVILLE's navigation and were blocking the channel and therefore contributed heavily to the accident. On the other hand, PERRYVILLE strongly contends that the tanker only discovered the tugs and tow blocking the channel when the PERRYVILLE was at, or near the Pilot Station, approximately one mile away; that she could not reasonably have discovered the danger before that time; and that thereafter her Pilot took every reasonable and prudent step to avoid the accident. The PERRYVILLE's Pilot and another experienced River Pilot strongly supported this position in their depositions and court testimony.

For the reasons set forth below, I cannot agree with this conclusion and find that PERRYVILLE was equally at fault with the tugs and tow and will assess damages accordingly.

The Tug CONNIE CENAC is a documented vessel of the United States with the following register dimensions: length 60.8 feet, breadth 19.6 feet, depth 8.0 feet, 71 gross tons, 48 net tons, with horsepower of 1000. The Tug CAPT. TENNER CENAC is a documented vessel of the United States with register dimensions as follows: length 59.8 feet, breadth 19.6 feet, depth 8.0 feet, 71 gross tons, 48 net tons, with horsepower of 800. The Barge CTCO 176 is a steel tank barge, 210 feet in length, 40 feet in breadth, and 12 feet in depth. At the

time in question the barge was laden with 12,511.38 net barrels of crude oil to a draft of 10 feet, 7 inches forward and 10 feet, 10 inches aft.

The Tanker PERRYVILLE is of T-2 design, "jumboized" in 1958, 583 feet in length overall, 80 feet in beam, 45 feet in molded depth, propelled by a turbo-electric engine to a single screw with 6000 horsepower, of a burden of 14,455 gross and 10,666 net tons. At the time in question the tanker was fully loaded with a cargo owned by Shell Oil Company including different grades of aviation gasoline, kerosene and heating oil. The cargo had been loaded at, and the PERRYVILLE sailed from Norco, Louisiana.

On the night of April 8, 1963, the CAPT. TENNER CENAC departed an oil rig in the Gulf of Mexico with the loaded barge CTCO 176 in tow on a hawser astern bound for the entrance of Southwest Pass, Mississippi River. Upon arrival below the entrance of the Pass, at about 2:00 P.M. on April 9th, the tug shortened the towing hawser to 30 feet. Thereafter attempts were made to cross the bar and enter the Pass between the ends of the jetties. The CAPT. TENNER CENAC did not have sufficient power, and each attempt resulted in the tug and barge being swept down 100 to 200 feet by the force of the current. As we have said, the river was in the seasonal spring rise and the velocity of the current, 3½ miles per hour in the pass itself, accelerates to 4½ miles over the bar at the end of the jetties. After each attempt The CAPT. TENNER and tow held up below and to the east of the east jetty end light where there is ample water. The CAPT. TENNER radioed her owner and was informed that the Tug CONNIE CENAC would proceed to its assistance. Thereafter the watch changed and the tug's captain went to sleep about 7:00 P.M., leaving a young relief captain in charge with a deck hand.

The PERRYVILLE, drawing 33 feet forward and 33 feet, 10 inches aft, downbound from Norco, exchanged pilots at Pilot Town, and entered the Head of Southwest Pass at 7:28 P.M. to transit the 20.2 mile run under the conn of the bar pilot. He was assisted on the bridge by the Master and Third Officer. The Quartermaster was at the wheel and a lookout at the bow. The wind was from the southwest at eight knots. The PERRYVILLE displayed two white range lights and red and green side lights, all burning.

The speed of the PERRYVILLE in still water at full ahead was 13½ miles per hour, half ahead 6½ miles per hour and slow ahead 3½ miles per hour. Adding the current to the still water speed, the PERRYVILLE would make 17 miles per hour in Southwest Pass. If the vessel were running at dead slow with the added current in Southwest Pass, the PERRYVILLE's speed would be seven miles per hour and she would have maintained steerageway. During her journey down Southwest Pass, which included several reductions in speed, she made good an average 15 miles per hour.

The CONNIE CENAC arrived below the east jetty end light and prepared to take in tow the CAPT. TENNER CENAC and her barge on a hawser astern. The CONNIE CENAC was in charge of the young relief captain assisted by a deck hand, the other watch being asleep. She had no lookout nor had the other tug. The deck hand went to the stern of the CONNIE CENAC and was there approximately ten minutes in arranging the towing line to the bow of the CAPT. TENNER. The CONNIE's relief captain absented himself from the wheelhouse forward and went aft to oversee the operation. By using the control station on the back deck, he swung the tug about to port, heading her in the opposite direction, and let her drift down in the current towards the bow of the CAPT. TENNER. The towing line on the CONNIE was led out 25 feet. The CONNIE's engine was then put full ahead. The engine of the CAPT. TENNER CENAC was already on full ahead, but the tug was on a stand still with the current. The relief captain of the CAPT. TENNER CENAC tied her wheel down

making the rudder straight and immobile. When the CONNIE began hauling, the flotilla gathered a little headway making not more than 1 or 1½ miles per hour.

No one aboard either of the tugs had seen the PERRYVILLE or knew of her presence. The tanker had earlier been seen from seaward by the Tug MAE LEE at a distance of several miles, as well as by the operator of the pilot boat while alongside the Pilot Station and when the tanker was up at Burwood. It was while the CONNIE's relief captain was walking forward to re-enter the wheelhouse that he first sighted the PERRYVILLE and estimated her to to be just above the Pilot Station.

[redacted] The PERRYVILLE contends that she did not see the danger, nor could she have reasonably discovered it prior to the time she reached the Pilot Station approximately one mile from the tugs. The Court does not agree. The dangerous situation was discovered, or could have been discovered with reasonable diligence at Light #5 which is 2½ miles upriver from the end of the jetties and at a time when adequate safety measures could have been taken and the near disastrous accident could have been avoided. Captain William Miller, the Master of the PERRYVILLE, testified:

"Q. Who was the first one on the PERRYVILLE that noticed the Cenac tow?

A. Well, all of us, I believe: the pilot, I was up in the pilot house, the third mate, all of us saw it.

Q. And where was the PERRYVILLE when the people on the bridge first sighted the CENAC tow?

A. Oh, we were above Pilot Town then, I mean above the Pilot Station.

Q. About how far sir?

A. I should say about two and a half miles from South Jetty light.

[redacted]

Q. All right, and was it at that time, sir, that the CENAC tow was in Block E?

A. That is correct.

Q. Did you sight the CENAC tow first visually?

A. Yes.

Q. Did you sight it on your radar at that time?

A. Yes." (Miller Dep., p. 73–74)

The use of radar was denied by the Pilot and Third Mate. The preponderance of the evidence is that the radar was not used, or certainly not properly used, at any relevant time. No satisfactory explanation was ever made for failure to use the radar and, under the circumstances existing at the time, this was highly negligent. The Pilot, Mr. Steinmuller, in his deposition taken in February 1964, stated that he had been following the assisting tug, CONNIE CENAC, all the way down the river and had seen it round up at the jetty preparatory to assisting the CAPT. TENNER CENAC. He was asked where the PERRYVILLE was when he first saw the lights of the tug down around the red light (end of jetties where the tugs were). His answer to this and further questions were as follows:

"A. When I swung to my 213–214 course.

Q. And would that be above or below the Pilot Station?

A. That would be above it.

Q. About how far above, sir?

A. About two miles.

* * * * * *

Q. What did this indicate to you, that *two tows* were coming up? (Emphasis supplied)

A. Yes, sir.

Q. And at this time, the light you had been following was still on?

A. Yes, sir.

Q. Now, how did these lights first come to your attention? Did you see them yourself or were they called to your attention by the

**322**

watch officer or by the captain or by the lookout, or what?

A. No, whenever we squared up on that 213–214 course, usually start looking (demonstrating).

Q. Did you indicate that you were using glasses?

A. Yes, sir, binoculars.

Q. The PERRYVILLE had a radar, didn't it?

A. Yes, sir.

Q. Was the radar watch being kept?

A. No, sir.

Q. Did anyone check on those lights in the radar to attempt to determine what they might be or what their course might be?

A. I didn't.

Q. Well, did you, to your knowledge?

A. Not to my knowledge." (Steinmuller Dep., p. 201–202)

He later attempted to minimize the significance of these lights, but the truth is that he simply chose to ignore them. He proceeded at full speed, not even taking the precaution of reducing his speed and utilizing the radar which was available. The fact of the matter was the CONNIE CENAC had arrived and joined the TENNER CENAC and began to move the loaded barge toward the red light. He would have seen not only the CENAC tow in the danger zone, but also an upbound deep-sea tug and barge which he passed later at the Pilot Station. The Third Mate was on the bridge of the PERRYVILLE that night and he testified as follows at the trial:

"Q. When was the first time, sir, that you saw any lights at the entrance to the Passes indicating the presence of other vessels, any other vessel?

A. Indicating the presence of any vessel, just above, maybe a half mile above the Pilot Station.

Q. That would be a mile and a half away?

A. Well, what we—

Q. I think you said the Pilot Station was about 1600 yards roughly.

A. Well, it was shortly above that when we became aware that there was traffic in the entrance, blocking the entrance.

Q. There had been no mention of these lights down around the entrance before that by the lookout on the bridge?

A. I don't recall any.

* * * * * *

Q. In any event, the discussion of the lights around the entrance to the Pass was about a half mile above the Pilot Station?

A. Yes.

Q. And you say you were confused as to what those lights were?

A. Just about that time, just about the time we were at the Pilot Station, that's where I first saw them and by the time we got to the Pilot Station I wasn't sure what they were.

Q. I think you said that Captain Steinmuller was somewhat confused also.

A. Yes, he didn't know what it was.

Q. How many lights did you see, Mr. DeGregorio?

A. Well, there are all kinds of lights on tugboats, house lights and several other kind of lights. But, the lights I had noticed— I didn't notice lights as far as whether or not she was towing astern or not, I noticed what I thought were navigating lights." (Trial Transcript p. 136–138)

PERRYVILLE reduced her speed at the Pilot Station to pass the upbound deep-sea tug and tow. Captain Steinmuller virtually conceded that at the Pilot Station he could see distinctly that he was running into trouble, *yet he resumed full speed.* The CONNIE CENAC had made up ahead of the TENNER and the tow was making slow headway; the tow tailed to the west almost blocking passage. The Pilot commented to the

Master about the close quarters and the fear of collision, and the Master stated a preference for grounding to avoid collision. On the Pilot's instructions the Third Officer called the engine room to standby for emergency full speed when the next bell was rung. With the tow where it was, Captain Steinmuller did not order left rudder as the Coast Guard Station was passed for fear of hitting the tow, and the PERRYVILLE continued on down the Pass for another 1000 feet. The PERRYVILLE sounded the danger signal, her engine was put to emergency full speed ahead, and her rudder was put hard to the left, all in rapid succession on the Pilot's orders. The tanker began her left swing when abeam the east jetty end red light, it being the Pilot's hope to squeeze through an opening astern of the barge CTCO 176 and the westerly edge of the channel. The PERRYVILLE swung around the 385 foot flotilla, clearing the barge about 50 feet to port. Her left swing, as the course recorder shows, began on a heading of 221° and continued for 1½ minutes until she fetched up on a heading of 187° aground just out of the westerly edge of the channel. At grounding, lighted buoy #3 was about 500 feet ahead, bearing fine on the port bow. The barge was then off her port quarter, and the lead tug, followed by the others, was entering the ends of the jetties and abeam the east jetty end red light, making a mile to a mile and a half miles per hour.

The pilot boat, lying to the east and below the red light, was summoned by whistle signals from the PERRYVILLE. Her operator came alongside and was told to obtain the identities of the tugs and barge. In about 20 minutes after the stranding, the pilot boat overtook the flotilla when the lead barge was abeam the Coast Guard Station. By means of search light, their identities were obtained in the presence of the Chief Boatswain Mate in charge of the Lighthouse and who had witnessed the stranding from his elevated station.

This Court has jurisdiction of these consolidated cases as admiralty and maritime matters, and venue is properly laid in the Eastern District of Louisiana.

■ Both the Tugs CONNIE CENAC and CAPT. TENNER CENAC were at fault. Neither captain surrendered command to the other, and the decision to enter the channel at the end of the jetties was the decision of each. In so doing, the tugs, one made up to the other for towing, were in plain violation of the regulation providing: "No vessel except small craft and towboats and tugs without tows, shall enter either South Pass or Southwest Pass from the Gulf until after any descending vessel which has approached within two and one-half (2½) miles of the outer end of the jetties and visible to the ascending vessel shall have passed to sea." [1]

■ The testimony of the tugs that they had already entered and were well up in the Southwest Pass when they passed the PERRYVILLE port to port some ten minutes before the tanker went aground from unrelated causes, is not supported in the evidence. Even aside from the foregoing regulation it is clear that the tugs, while in the severe bottleneck and lying at the dogleg turn, improperly blocked the tanker's lawful channel and embarrassed her navigation.[2]

■ The two young relief captains in charge of the CONNIE CENAC and CAPT. TENNER CENAC required no Coast Guard licenses, but each was untrained and uninstructed in the applicable regulations governing Southwest Pass and neither had personal knowledge of the regulation in question. Inadequacy of personnel is a fault in manning

1. 33 C.F.R. § 207.200(6d).

2. Deep Sea Tankers, Ltd. v. The Tug Long Branch, et al., 258 F.2d 757 (2nd Cir. 1958); Wood Towing Corp. v. Paco Tankers, Inc., 152 F.2d 260 (4th Cir. 1945). Moran Towing & Transportation Co., Inc. v. Conners-Standard Marine Corp., 285 F.2d 368 (2nd Cir. 1960).

for which their vessels and owners are liable.[3]

■ Although the evidence is in dispute, the weight of the credible testimony is that each tug and the barge were improperly lighted. The Inland Rules required the tugs to display ahead three white lights in vertical line to indicate they were towing astern.[4] The barge itself was required to display red and green side lights on its forward corners, and two white lights at the stern, five feet apart and four feet above the deck, visible for two miles on this clear dark night.[5] The flotilla was not so lighted. However, the PERRYVILLE had seen the tow above the Pilot Station and the Court concludes that the possibility of improper lights did not play any part in the grounding.

The absence of any lookout whatsoever on either of the tugs proved a serious contributing fault. The high elevated white range lights of the downbound PERRYVILLE had been seen by the navigators of the pilot boat and the Tug MAE LEE at a substantial distance of several miles, yet no one, on either tug knew of the presence of the PERRYVILLE until the lead tug's Relief Captain observed her "right above the Pilot Station" as he was walking forward to return to the wheelhouse and after he had made up to the CAPT. TENNER. The Relief Captain on the second tug "happened to look ahead" and saw the PERRYVILLE about the same time. Though ignorant of the existence of the regulation itself, the tugmen were aware of a "right-of-way" in favor of a downbound vessel exiting the jetties' end. It is fair to infer from their testimony that had they observed the PERRYVILLE 2½ miles away, when she was at Light #5, and clearly visible up the straight reach, they would have held

back below and to the east of the east jetty end light, where the CAPT. TENNER had spent much of that afternoon inbetween her fruitless attempts to enter.

The PERRYVILLE was also at fault. PERRYVILLE claims that at Light #5, two and one-half miles above the jetty ends, the Pilot had distinguished well astern of the deep-sea tow which was proceeding up the Pass, "some distant lights to the south and one to the southwest;" that he kept them under observation; that both of the lights appeared to be well to the south of the entrance; that the PERRYVILLE had the right to assume that other navigators would obey the law and stay outside the channel; and that the sighting of the lights at a distance to seaward was not unusual, was not any reason for earlier apprehension, and did not indicate any risk of collision during the normal transit of this section of the Pass when at full speed. To reach this conclusion, PERRYVILLE takes the testimony most favorable to this view but ignores more probative evidence to the contrary, such as quoted above. At Light #5, the PERRYVILLE's Pilot, Master and Mate saw the lights at the end of the jetties and near this dangerous passage and considering the limited vision, the dangerous cargo and fast current, the PERRYVILLE simply could not reasonably and prudently proceed at full speed.

■ It was conceded that the PERRYVILLE could have been safely stopped with its engines in a mile and a half. There was, therefore, ample time to avoid the dangerous confrontation which took place. Except for a reduction to one-half speed at the Pilot Station in deference to the larger deep-sea tug steaming upstream, the PERRYVILLE from the moment it discovered strange lights in this dangerous passage, maintained full speed

3. Navegacion Castro Riva, et al. v. M/S Northolm, et al., 1960 A.M.C. 1875; The Greater New Orleans Expressway Commission v. The Tug Claribel, and Barge TJ–55, Jahncke Service, Inc. and The Home Insurance Company, 222 F.Supp. 521 (E.D.La.1963), affirmed Coleman v.

Jahncke Service. Inc., 341 F.2d 956 (5th Cir. 1965).

4. Inland Rules, Art. 3, 33 U.S.C. § 173.

5. Pilot Rules for Inland Waters, 33 C.F.R. § 80.16.

ahead and trusted to luck that everyone would clear out of the way by the time it arrived. Its failure to slow down; its failure to keep a proper lookout; its failure to use its radar, especially considering the dangerous passage and its extremely dangerous cargo, condemn the PERRYVILLE of gross negligence which contributed heavily to its grounding and consequent damage. If the Pilot did not correctly appraise the situation at Light #5, he was sufficiently confused to be put on inquiry, to blow a danger signal and to proceed with caution.[6] In the Chotin, Inc. and Chotin Towing Corp. v. S.S. Gulfknight, her engines, etc. case the Court said:

> "It is the duty of a vessel in the exercise of prudence and caution to stop its engines or timely reduce speed in the presence of danger or anticipated danger, otherwise it will be condemned for its failure to do so."

See also A. H. Bull S.S. Co. v. Chesapeake S.S. Co., 101 F.2d 599 (4th Cir. 1939); Griffin on Collision, p. 86 § 35; Articles 27 and 29 Inland Rules.

■ As to the possibility of subsequent negligence, the Pilot and Mate testified that after the PERRYVILLE reached the Pilot Station, she was committed and could only proceed ahead at full speed. The Court is not convinced that such is the case. If we take Captain Steinmuller at his word, that he did not discover the danger until he was at the Pilot Station, his testimony was not convincing that under the circumstances he acted as a knowledgeable and prudent navigator when he ordered full speed ahead. A fact finder is required to accord great weight to the testimony of an expert but may reject it entirely if he concludes the reasons given in support of the opinion are unsound. I was not impressed with the reasons given by either Captain Steinmuller or Captain Arculeer. Neither satisfactorily explained why slowing the ship's speed and grounding her sooner would not have been safer and more desirable under the circumstances, or why the use of both anchors at a reduced speed would not have been effective. In any event, had the ship's speed been reduced at the time the danger was discovered, or could have been discovered by the exercise of ordinary care, the accident may not have occurred at all.

■ The failure to use radar in the lower reaches of Southwest Pass was also negligent, particularly at nighttime. Although radar is a relatively new navigation aid, there are numerous cases condemning the failure to use it.[7] In the Trawler Medford, Inc. v. United States, case the Court said:

> "The failure of the [barge] to use her radar is the most serious and sinister aspect of these causes. The perfection of that device is thought to have invoked a new concept of the responsibilities attaching to vessels so equipped, * * * "

The Second Circuit Court of Appeals in Afran Transport Co. v. The Bergechief (A/S Sneffon v. The Burgan) held that the failure of a vessel to use her radar when conditions warrant its use, imposes upon her the burden of proving that her failure did not contribute to the collision.

PERRYVILLE was additionally negligent by failing to have a lookout. An A.B. was sent to the forecastlehead to act as a lookout, but he was recalled to the bridge by the Third Mate when the PERRYVILLE was in the vicinity of the Pilot Station, the most critical time.

The Clerk will prepare an interlocutory judgment in accordance with the above.

6. Tidewater Associated Oil Co. v. The Syosset, 203 F.2d 264 (3rd Cir. 1953); General Seafoods Corp. v. J. S. Packard Dredging Co., 120 F.2d 117 (1st Cir. 1941); Chotin, Inc. and Chotin Towing Corp. v. S.S. Gulfknight, her engines, etc., 266 F.Supp. 859 (E.D.La.1966).

7. Trawler Medford, Inc. v. United States (D.C.N.Y.1946), 65 F.Supp. 622; The Thomas H. Barry—The Medford, 65 F. Supp. 622; Afran Transport Co. v. The Bergechief (A/S Sneffon v. The Burgan) 2 Cir., 274 F.2d 469, 1960, 37 Tulane Law Review 621.